BRAZOS RIVER AUTHORITY, Petitioner

V.

CITY OF GRAHAM, Respondent

No. A-7912.  Decided October 3, 1961
Rehearing Denied January 24, 1962
354 S.W. 2d 99

168

JUSTICES SMITH, GRIFFIN and HAMILTON dissented.

*Roger Tyler,* Austin, *J. R. Creighton,* Mineral Wells, *Brown, Herman, Scott & Young,* Fort Worth, *J. Robert Howard,* Lubbock, *Martin Harris,* and *Clark, Mathews, Thomas, Harris & Denius,* Austin, for petitioner.

*Jennings & Montgomery, Graham,* for respondent.

MR. JUSTICE NORVELL delivered the opinion of the Court.

Based upon special findings of a jury, the District Court of Young County, Texas, rendered judgment for the sum of $430,-750.00 in favor of the City of Graham and against the Brazos River Authority. The Court of Civil Appeals affirmed. 335 S.W. 2d 247.

The City's theory of recovery was that the River Authority had taken or damaged three pieces of property owned and used by it in carrying out its municipal functions. Article 1, Sec. 17, Texas Constitution. The jury found that the City's sewage disposal plant, its water treatment plant and its Salt Creek "channel reservoir" had all been rendered subject to flooding as a result of the "construction, maintenance and operation of Possum Kingdom Dam and the siltation * * * resulting therefrom". It also found that the intrinsic value of the sewage disposal plant "at the present time had Possum Kingdom Dam not been constructed and maintained and operated" would have been $140,000.00, but that by reason of the construction, maintenance and operation of such dam, the value of the sewage disposal plant was only $750.00 at the present time; a difference of $139,250.00. Similar findings were made with reference to the water treatment plant, (before, intrinsic value—$250,000.00; after—$1500.00—difference — $248,500.00), and the "channel reservoir" (before, intrinsic value—$43,000.00; after—none—difference—$43,000.00).

The River Authority as petitioner in this Court attacks the judgments of the courts below by nine points of error wherein it asserts that the Authority is not liable in law for injuries resulting from the flooding of any of the respondent City's facili-

ties; that as a matter of law, the evidence relating to damages will not support a recovery for the damaging or taking of the water treatment plant or the "channel reservoir"; that the City's action is barred by the two year statute of limitations, Article 5526, Vernon's Ann. Texas Stats.; that the District Court erroneously excluded from evidence a purported release executed by the City to the Authority, and that the trial court erroneously instructed the jury as to the measure of damages and improperly commented upon the weight of the evidence.

Petitioner under its first contention above mentioned asserts that the City as an upper riparian on the Brazos has no vested right to have the waters of the Brazos and its tributary, Salt Creek, flow by its land at undiminished speed and that it is the checking of the flow of the river by the operation of the Possum Kingdom Dam that causes siltation which in turn brings about a rise in the water level of the Brazos and Salt Creek and results in the flooding of respondent's property; that petitioner is entitled to use the bed and banks of the Brazos for the storage and flow of water under the statutory direction of the State, and that respondent's lands are subject to a servitude whereby damages resulting from the State's efforts to control flood waters cannot be recovered from the State.

The pertinent facts of the case, particularly those relating to the first argument or contention of the petitioner above mentioned, are:

The Brazos River Authority, formerly the Brazos River Conservation and Reclamation District, is a public governmental agency created directly by legislative enactment under authority of the Conservation Amendment to the Texas Constitution. See Article 16, Sec. 59, Texas Constitution, Article 8280-101, Vernon's Ann. Texas Stats. In 1941, the Authority constructed the Possum Kingdom Dam across the Brazos in Palo Pinto County. This dam is located to the west and upstream from the City of Mineral Wells. The spillway of the dam is one thousand feet above sea level. The construction of the dam resulted in the formation of Possum Kingdom Lake which covers some 26,000 acres and extends from the dam in a generally westerly and northerly direction for some sixty-five miles up the Brazos. In order to provide for the bed and banks of such lake, the Authority secured, by purchase or condemnation, lands and easements over lands for permanent or intermittent flooding up to the 1100 foot contour mark, although this was not the invariable practice or rule. Gooseneck Bend on the Brazos is a large ox-bow

loop located approximately fifty-five miles up the Brazos from the Possum Kingdom Dam. Salt Creek flows approximately north to south and joins the Brazos at Gooseneck Bend. The City of Graham is located on the east side of Salt Creek. Its sewage disposal plant is located near the southwest corner of the city limits on the west side of the creek and about three miles up stream from the Salt Creek-Brazos confluence. This plant was built in 1923, long before the construction of the Possum Kingdom Dam, and has been improved and modernized since that time. The "channel dam" heretofore mentioned is located across Salt Creek approximately one and a quarter miles above the sewage disposal plant. This dam was built in 1908 and enlarged in 1923. It creates a small channel reservoir in Salt Creek which holds about ten acre feet of water and is used as an emergency or standby water supply for the City. The City's water treatment plant is located on the east side of Salt Creek about 1200 feet upstream from the channel dam and about a mile and a half above the sewage disposal plant. The main source of the City's water supply comes from two reservoirs, Lake Graham and Lake Eddleman, which are upstream from the water treatment plant and located on separate branches of Salt Creek. These lakes are connected by a canal and water is taken from them through Lake Eddleman to the water treatment plant by means of a 16 inch pipe line.

The elevation of the clarifier outlet of the sewage disposal plant is 1003.94 feet above sea level. The clarifier wall is two feet higher in elevation. The elevation of the top of the channel dam is 1009.97 feet while the engine room floor of water treatment plant is at an elevation of 1019.09 feet. When the water in Salt Creek rises above an elevation of 1003.94 feet, the sewage disposal plant is rendered inoperative with the result that raw sewage flows into the creek. When the water rises above the top of the channel dam, 1009.97, the water behind and impounded by the dam is rendered unfit for municipal use, and cannot be processed by the water treatment plant. When the water mark exceeds 1019.09 feet, the operation of the water treatment plant is severely hampered and it cannot effectively process waters from the city reservoir.

It appears that all these facilities of the City have been flooded to a more or less extent upon one or more occasions. The sewage disposal plant has been repeatedly flooded.

The nature and extent of the siltation problem in Possum Kingdom Lake is fully developed by the testimony. The head-

waters of the Brazos are located in New Mexico but little or none of the water which falls in the Brazos watershed west of the caprock in West Texas reaches Possum Kingdom Lake. The Brazos watershed lying between the caprock and Gooseneck Bend is approximately 13,000 square miles. The area is semiarid and the waters drained from the basin are heavily laden with silt. For a ten-year period extending from 1924 to 1934, the river carried annually about 9,900,000 tons of silt past the Mineral Wells gauging station (about 65 miles below Gooseneck Bend) according to the measurements of the United States Geological Survey. One witness described the silt carriage load of this period as being the equivalent of 6,506 acre feet per year. For an approximate 13-year period from 1941 to 1954, the annual silt carriage measured at the South Bend gauging station (about ten miles above Gooseneck Bend and above the backwater of Possum Kingdom Lake) was considerably less, being 3,760,220 tons per year. This was explained by the presence of drought conditions during the 1941-54 period in which the water drained from the river basin was reduced from an average of 953,550 acre feet per annum for the 1924-34 period to 467,179 acre feet annually for the 1941-54 period. The average annual silt load carried over the Possum Kingdom Dam for the 1941-54 period was 88,065 tons as compared to 3,760,220 tons of silt carried into the reservoir. In other words, during a 12.71 year period ending in 1954, some 46,673,090 tons of silt was deposited in Possum Kingdom Lake. Less than three per cent of the silt carried into the Lake was taken out.

This process of siltation has resulted in the raising of the floor of the Lake above the elevation of the original bed of the river and the narrowing of the channel of the stream of the current running through the waters of the Lake. At and near the head of the Lake—around Gooseneck Bend—the siltation and sedimentation has been extremely heavy. When the flowing water of the Brazos reaches the static water of the Lake, with the consequent slowing of the speed of the waters, the heavy particles of silt known as the "bed load" are deposited resulting in the formation of sandbars and similar barriers in the bed and shores of the upper portions of the Lake.

The rise in the elevation of the level of the waters in the river and in the Lake at Gooseneck Bend is indicated by the testimony of the witness Robert Gooch. His testimony and charts showed the following water elevations in 1938—before the construction of the dam;—in 1941,—immediately after the construction of the dam,—and in 1954, after the dam had been in

operation for some thirteen years, according to various quantities of water which would pass by a given point on the river measured in cubic feet per second.

| Water flow cubic feet per second | 1938 before dam was constructed | 1941 immediately after dam was constructed | 1954—dam in operation for 13 years | Difference in elevation between 1941 and 1954 |
|---|---|---|---|---|
| 10,000 | 990.7 | 1000.3 | 1003.4 | 3.1 |
| 20,000 | 995.3 | 1001.0 | 1006.2 | 5.2 |
| 30,000 | 998.4 | 1002.0 | 1008.5 | 6.5 |
| 40,000 | 1000.9 | 1003.5 | 1010.6 | 7.1 |
| 50,000 | 1003.9 | 1005.0 | 1012.3 | 7.3 |

This rather graphically represents the effects of the siltation occurring in the Lake. The witness Gooch also testified that based upon 19 years of data relating to the water flow of the Brazos, he estimated that under conditions as they existed in 1954-55, the water level of the Lake at the location of the City's sewage disposal plant on Salt Creek (about three miles upstream from Gooseneck Bend) and in the vicinity of the City's other installations, would reach an elevation of 1005 (1.1 feet above the clarifier outlet) whenever the Brazos carried a water flow of 15,000 cubic feet per second, and that a flow of 15,000 second feet or more would occur once every eight or nine months on an average. Other estimates of the witness were that a flow of 19,000 second feet would raise the elevation to 1006 feet and occur on an average of once every 11 months, that a flow of 37,000 second feet would raise the water elevation to 1010 feet (above 1009.97 feet, the elevation of the top of the channel dam) and occur on an average of once every two years and five months; that under 1954-55 lake and riverbed conditions, a flow of 100,000 cubic feet would result in a water level of 1019 feet, the approximate level of the floor of the City's water treatment plant. Mr. Gooch stated that he had no record of a 100,000 second foot flow during the 19-year period immediately before 1954, but that "within the memory of people living in this area there have been floods on the Brazos of 100 thousand cubic feet per second, although it was not measured by the U. S. Geological Survey at that time." He also stated on the basis of engineering knowledge of rivers, that much larger floods have occurred on rivers the size of the Brazos and that a flow of 100 thousand cubic feet per second is not much of a flow for that river because of the enormous drainage area involved, some 13,000 square miles.

Obviously the estimates as to water elevations and average

periods of flooding are approximate only. There are variables of a minor nature that also enter into these estimates and predictions. Undoubtedly the flow from the Salt Creek watershed between Lake Graham and Lake Eddleman and the creek's confluence with the Brazos—approximately six miles—has some effect upon the water levels in Salt Creek opposite the City's installations, and there are minor differences in the position of the sewer disposal plant and the water treatment plant on Salt Creek which would affect in a small way the calculations of water levels. However, there is no serious conflict in the testimony relating to the rise in water elevation caused by the siltation process taking place in Possum Kingdom Lake and what has been said above gives an accurate though approximate picture of the situation.

We consider first that portion of the judgment relating to the sewage disposal plant. This represents a recovery of $139,-250.00 in damages. The court considered that a "taking" of the plant had resulted because of its being subjected to repeated floodings as a result of the construction, maintenance and operation of Possum Kingdom Dam. The judgment specifically describes the tract of land upon which the plant is located, together with easements incident thereto, and then provides that such property by force of the judgment is subjected "to an easement or servitude in favor of the Brazos River Authority so that (the Authority) may, without further liability, flood, overflow, inundate or submerge said properties by reason of the construction, maintenance and operation of Possum Kingdom Dam with the crest of the spillway gates at elevation of 1000 feet above mean sea level; and that the easement or servitude herein awarded (shall) become effective upon and only upon the payment of the damages herein awarded."

It therefore appears that we have a proceeding in the nature of an inverse condemnation in that the Authority has taken the property of the City and now the City is attempting to recover compensation for such taking. Unless it can be said, as contended for by the petitioner, that the Authority was legally entitled to flood the City's water disposal plant in carrying out its flood control and kindred activities, the fact of a taking can hardly be questioned. The plant was constructed before Possum Kingdom Lake came into existence. When constructed it was not subject to flood damage, except in case of the highest waters in Salt Creek, but now as a result of the existence of the Lake and its heavy siltation, the plant is subject to repeated overflows which, when present, render its operations impossible and cause raw

sewage to be discharged into the Creek and by backwater action carried up the stream along the western border of the town. Fort Worth Imp. Dist. No. 1 v. City of Fort Worth, 106 Texas 148, 158 S.W. 164, 48 L.R.A. (N.S.) 994; Chicago Rock Island & Gulf Ry. Co. v. Tarrant County Water Control and Improvement Dist. No. 1, 123 Texas 432, 73 S.W. 2d 55; Tarrant County Water Control and Improvement Dist. No. 1 v. Fowler, Tex. Civ. App., 175 S.W. 2d 694, wr. ref. w.o.m.; 2 Nichols on Eminent Domain (3rd Ed.), 236, 253, Secs. 6(1), 6.22, 6.23; 16 Tex. Jur. 436, Eminent Domain Sec. 251.

Petitioner contends that an upper riparian owner such as the City of Graham has no legal right to have the water in a stream flow at its customary rate of speed in coursing by or through his or its premises. As a corollary to this position, it is asserted that as most of the siltation in the Lake is caused by particles of soil being deposited on the bed and banks of the Lake as a result of of the diminution in the speed of the water flow, such injury as may result to the upper riparian is noncompensable. It is also urged as essentially a part of the same argument, that the bed and banks of the river are owned or subject to the control of the State and hence may be used by the Authority for water storage and flood control purposes without its being liable to the owners of the upland along the shores of the stream.

This argument so far as we have been able to ascertain has never been accepted in any jurisdiction. What it amounts to is the assertion that although the Authority would have to pay compensation under Article 1, Sec. 17 of the Constitution for those lands which would be covered with water immediately after the construction of the dam—the first filling of the lake, —any subsequent inundations caused by the maintenance and operation of the dam would be damnum absque injuria. In other words, it is an assertion that the taking and damaging of lands in addition to the taking for the original bed of the lake is justified under the police power. This question then naturally arises: The surface elevation of the lake when full in 1941, immediately after the construction of the dam would be approximately 1005 feet above sea level at a flow of 50,000 second feet,[1] why then did the Authority adopt the general policy of acquiring lands for overflow purposes up to the 1010 line? The answer to this question is that, from an engineering standpoint, it may be reasonably anticipated that as the dam is used and operated

---

1. The 50,000 second foot figures are used because of the Authority's assertion that a water flow in this magnitude on the Brazos is most unusual.

throughout the years the high water contour lines of the lake will rise,[2] and that from a legal standpoint, there has been no recognition of, nor can there be a rational line of demarcation drawn distinguishing periods of high water which occur within a few days or months after the completion of the dam and are occasioned solely by the construction thereof, and floods which take place some years thereafter as a result of the operation and use of the dam for water impounding purposes. To attempt a distinction between the power of eminent domain and an exercise of the police power along this line would, as intimated by the Court of Civil Appeals, involve us in a sophistic Miltonian Serbonian Bog.

Governmental agencies and authorities are necessities. They are capable of rendering great and beneficent public services. But any appeal to the tradition of our laws which omits a decent regard for private property rights is both inaccurate and distorted. It is because of this regard that our governmental agencies and authorities in acquiring properties for their public purposes are generally required to proceed under the power of eminent domain rather than under the police power. Such a policy has not resulted in a destruction of flood control and improvement agencies in the past and there is no reason to apprehend that the continuation of such policy will prove overly costly or inimical to the American way of life in the future.

The geographical location of the City's sewage disposal plant with reference to the artificial lake created by the erection of the dam is unusual, but the problem of damages created thereby should not operate to vary the established rule of compensation contemplated by the Constitution. It would be manifestly unjust to say that because much land and property in the lower reaches of the river and below a flood control dam would be saved from damage and destruction, the dam constructing authority should be allowed to take lands lying above the dam for water storage purposes under the police power without paying compensation therefor.

It may be that a riparian is in no position to complain of the slowing of the waters running in a stream adjoining his land—when this is his sole complaint. But, that is not the case before us, nor are we concerned with the rights of riparians in and to

---

2. The life of the lake under present operating conditions, e.g. without the erection of silt screening dams or the conducting of dredging operations, is estimated at approximately seventy years. At that time its abandonment would be forced because of the shallowness of the lake and spread of its waters like the proverbial Powder River—"a mile wide and an inch deep".

flood waters as was the case in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458. Our problem here need not be pulverized into molecular parts in an attempt to fit it into the dictum of some particular case which was essentially concerned with a wholly different question than that now before us. Our questions may be simply restated thus: Does the operation of the dam and the consequent formation of the Lake cause the flooding of respondent's property? This must be answered in the affirmative and thus a second question is raised: Can a valid distinction be drawn between flooding which results from the building of the dam only and flooding which occurs as a result of the construction of the dam and the resulting siltation of the reservoir acting together? Keeping the critical elevation of the sewage disposal plant in mind—1003.94 feet, and referring to the table in the forepart of this opinion, it will be seen that a flow of more than 40,000 second feet would be required to flood the sewage disposal plant immediately after the dam was constructed. By 1954, because of siltation, a flow of slightly more than 10,000 second feet would bring the water level above the clarifier outlet of the sewage disposal plant.

In our opinion, the siltation of a reservoir to some extent is clearly foreseeable. It is indicated by the engineering testimony that the formation of silt depositions is taken into consideration as a part of the engineering problem. In Tarrant County Water Control and Improvement Dist. No. 1 v. Fowler, Tex. Civ. App., 175 S.W. 2d 694, wr. ref., w.o.m., 142 Tex. 375, 179 S.W. 2d 250, the court mentioned the problem of the filling in of the channel of a stream by soil and gravel. The court said:

"This condition, (of flooding) in our opinion, will become progressively more serious, as it was shown that during the last few years, the bed of Ash Creek has half filled with sand and gravel, diminishing its carrying capacity, and, obviously, in times of heavy rainfall, will cause the water to leave its bed and spread out over the adjacent land. That these results were contemplated when the dam was erected is shown, we think, by the evidence of the engineer upon whose plans and advice the dams and reservoir were constructed."

■ As to the sewage disposal plant, we are in agreement with the Court of Civil Appeals. The record establishes the fact that this installation or portions thereof will be repeatedly inundated by the back waters of the Brazos and Salt Creek. A "taking" under the constitutional provision is involved, and under our constitution the Authority is liable to pay just compensation

therefor. Article 1, Sec. 17, Texas Constitution; United States v. Dickinson, 331 U.S. 745, 67 S. Ct. 1382, 91 L. ed. 1789; Hidalgo County Water Improvement District No. 2 v. Holderbaum, Texas Com. App., 11 S.W. 2d 506.

It seems however that under the evidence, the water treatment plant and the channel reservoir are not in the same category as the sewage disposal plant. The judgment of the trial court relating to all of the City's facilities proceeds upon the theory that they have been taken by the Authority and hence upon payment of compensation—that is, the damages assessed by the jury—the Authority is entitled to a perpetual easement over the lands occupied by such installations of the City. The Authority here persuasively presents the contention that when the sewage disposal plant of the City ceases operations, the only damage shown to the water treatment plant is a mere possibility of flooding which will not support the recovery allowed by the jury.

It is pointed out that one of the deleterious effects of the flooding of the sewage disposal plant is the contamination of the waters of Salt Creek with raw sewage. When the backwater in the creek rises above 1009.97, it flows over the dam of the channel reservoir and destroys the City's emergency or standby water supply. In the event a break in the conduit from Lake Eddleman to the City's water treatment plant should occur at the same time the channel reservoir was contaminated by sewage, the City would be without a safe supply of water for domestic use. At the present time there is an inter-relation between the three municipal facilities, i.e., the sewage disposal plant, the channel reservoir and the water treatment plant, but in considering damages for the taking or damaging of such properties, they must be considered separately as urged by the Authority. The City, after having been paid the sum of $139,250.00 (the amount of damages found by the jury) for the taking of its sewage disposal plant, would not be entitled to claim further damages to its channel reservoir and its water treatment plant because the City continued to operate the sewage disposal plant despite its susceptibility to repeated floodings. In arriving at the monetary recovery for the taking or damaging of the channel reservoir and the water treatment plant, we must consider the situation as if the sewage disposal plant were not in existence. Once the sewage disposal plant has been paid for by the Authority, the element of sewage contamination is removed from the picture. What we have left is damage to the channel dam and the water treatment plant caused by the rise in the level of the water (un-

contaminated by raw sewage) occasioned by the construction, maintenance and operation of Possum Kingdom Dam.

■ There is a species of damage to land that is probably non-recurring, or at least may not recur for some substantial length of time. Examples of this type are floods occasioned by extremely heavy or unprecedented rainfalls, coupled with some obstruction of a water course. The person responsible for the obstruction of the water course may be liable, in part at least, for the damages caused by the type of flood described. He would not however be liable to the same extent that he would be in cases of continuous or repeated floodings of land. This would be particularly so when such floodings occurred at widely spaced intervals in point of time. It is conceivable that the factual situation in this case points to a time in the future when the waters of Salt Creek would repeatedly inundate the City's water treatment plant with its critical elevation of 1019.09 feet, but the situation has not as yet become "stabilized", that is, it has not become sufficiently definite and certain to support the trial court's theory of recovery.

In United States v. Dickinson, 331 U.S. 745, 67 S. Ct. 1382, 91 L. ed. 1789, the Supreme Court of the United States, in connection with a limitation question, considered a problem similar to that now before us. The United States Government did not condemn lands needed for the basin of a lake caused by the construction of a dam but "left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy." In the course of its opinion, the Court said:

"The source of the entire claim—the overflow due to rises in the level of the river—is not a single event, it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck."

By analogy, what was said in the Dickinson case has some application here. An admittedly difficult problem is presented and some additional statement is required. As pointed out in the forepart of this opinion, there was expert testimony that under river and lake bed conditions as they existed in 1954, a

flow of 100,000 second feet in the Brazos would be necessary to raise the water level in Salt Creek adjacent to the City's installations to an elevation of 1019 feet, near the floor elevation of the water treatment plant, and that in the 19-year period prior to 1954, a flow of such dimensions had not occurred. There is some evidence that in 1957 the water in Salt Creek arose above the floor of the water treatment plant, although the Authority disputes the occurrence. It appears that heavy precipitation on the comparatively short watershed of Salt Creek acting in conjunction with a rise on the Brazos contributed to this rise in the level of the water. However, conceding that the watershed of the Brazos is fully capable of procuring and the river has in times past experienced a flow of 100,000 second feet in the vicinity of Possum Kingdom Lake and that the Lake's level to some extent is affected by heavy local precipitation in the Salt Creek vicinity, that is not evidence that 1019 foot floods have become recurring and certain phenomena to the extent that we may say that a permanent, as distinguished from a sporadic damage, has taken place. There is evidence that the danger of flooding may increase with the passage of years and that engineers have advised the City to remove its water treatment plant to another location, particularly in view of the fact that much of the plant will have to be replaced because of obsolescence and an enlarged installation is required by the growth of the City. On the other hand, the plant is now in operation. It was not destroyed by the 1957 high water. The jury's findings of damages were predicated upon an estimate which practically accounted for the entire value of the plant. In order to support the jury's findings in this regard, it would be necessary to say that one flooding of the plant, coupled with the possibility of further floodings at uncertain and perhaps widely spaced intervals, is sufficient in law to support the award. This we cannot do without entering the realm of conjecture, speculation and guess work. It may be entirely possible that the water treatment plant could be used for years to come without another re-flooding or until, by ordinary wear and tear and natural obsolescence, it had become unsuitable for the purpose for which it was constructed. It would seem that the safer rule to follow is one requiring the plaintiff in actions such as this to establish definitely by evidence above the dignity of conjecture that the damage claimed is the result of a repeated and recurring injury rather than a sporadic one. Until a plaintiff is in position so to establish the repetitious nature of the injury, he should be confined in his demand for damages to those flowing directly from the single injury or flooding.

The evidence here relied upon to establish a complete destruction (for all practical purposes) of respondent's water treatment plant "fails to give any certain or reliable basis for the recovery sought and the verdict rendered but left the jury to wander through the domain of surmise and speculation in order to reach the verdict rendered." Fort Worth & Denver City Ry. Co. v. Speer, Texas Civ App., 212 S.W. 762, 765, no wr. hist.

In Austin & N. W. Ry. Co. v. Anderson, 79 Texas 427, 15 S.W. 484, a case dealing primarily with a limitation question, this Court discussed the various types of actions arising from the flooding of lands because of the erection of structures along or across water courses. In speaking of occasional injuries resulting from sporadic high waters the Court said: "But where it (the damage) is not permanent, but depends on accidents and contingencies so that it is of a transient character, successive actions may be brought for injury as it occurs; * * *." This temporary type of injury mentioned in the Austin case is all that the evidence here suggests. A case for permanent injury such as envisioned by the jury verdict has not yet matured. See also, Baker v. City of Fort Worth, 146 Texas 600, 210 S.W. 2d 564, 5 A.L.R. 2d 297.

While the evidence shows that the channel reservoir by reason of the lower elevation of its dam will be flooded more often than the water treatment plant, it is not shown that in the absence of the creek's backwater being contaminated with sewage, the channel reservoir would be seriously affected by the presence of ordinary flood waters therein. It certainly would not be totally destroyed as found by the jury.

■ We next consider the Authority's claim that the City's action is barred by the two year statute of limitations. Article 5526, Vernon's Ann. Texas Stats. The City, in turn, points out that in 1953 the Legislature amended Article 5517 of the Revised Statutes so as to read as follows:

> "The right of the State, all counties, incorporated cities and all school districts shall not be barred by any of the provisions of this Title, nor shall any person ever acquire, by occupancy or adverse possession, any right or title to any part or portion of any road, street, alley, sidewalk, or grounds which belong to any town, city, or county, or which have been donated or dedicated for public use to any such town, city or county by the owner thereof, or which have been laid out or dedicated in any manner to public use in any town, city or county in this

State." (Italics supplied.) See Article 5517, Vernon's Ann. Texas Stats.

The Title referred to in said Article 5517 is Title 91 relating to Limitations. The Authority argues that the Legislature meant to refer to Chapter 1 of Title 91 which contains only the limitation articles relating to suits for land. This brings to mind the maxim that "If Parliament does not mean what it says, it must say so."[3] Newton v. Barnes, Texas Civ. App., 150 S.W. 2d 72, wr. ref. If we were to approach the problem from the standpoint of the wisdom of the Legislature enactment, we could perhaps conclude that the Legislature may have had real property limitations only in mind. But this is an approach which may not be employed by the courts. We may not invade the legislative field. 50 Am. Jur., 212, Sec. 228. There is nothing ambiguous or uncertain about the literal meaning of the Act and hence no need to explore its legislative history. The Act simply states that, "The right of the State, all counties, incorporated cities and all school districts shall not be barred by any of the provisions of this Title, * * *." Article 5526 is a part of the Title of the Revised Statues referred to. "The rule permitting departure from the literal meaning has no application at all where the statute is unambiguous and embodies a definite meaning and the intention of the legislature as expressed in the law is reasonably free from doubt." 50 Am. Jur. 239, Statutes, Sec. 241. The amended act has remained on the statute books unchanged in wording since 1953, and we are not at liberty to depart from the literal meaning of the article at this time.

We might add, however, that insofar as the sewage disposal plant is concerned, we have a taking by inverse condemnation and the great weight of American authority supports the position that, absent a particular statute covering the situation, the land limitation rather than the general limitation statutes apply to such inverse condemnation proceedings. Ackerman v. Port of Seattle, 55 Wash. 2d 400, 348 P. 2d 664; Aylmore v. City of Seattle, 100 Wash. 515, 171 Pac. 659; Oklahoma City v. Wells, 185 Okl. 369, 91 P. 2d 1077; cases collected in Annot., 123 A.L.R. 676; 18 Am. Jur., Eminent Domain, Sec. 394. The Texas

3. This expressive phrase probably originated with the Honorable A. P. Herbert, M.P., (Uncommon Law, p. 192). Mr. Herbert also suggested that judge-made law is often superior to all other types. (Id. 84) However that may be from an empirical standpoint, operating as we are under a strict theoretical division of governmental powers, it would take a bit of doing on the part of the judiciary to say, in the absence of ambiguous and uncertain statement or patent and manifest absurdity, that the Legislature intended something different from the clear import of the words chosen by it, i.e. that the Legislature intended "Chapter" when it used the word "Title".

rule is in accord. In case of a "taking" of property, the City's right thereto would not be barred if ever until the expiration of the ten year period necessary to acquire lands by adverse possession under Art. 5510, Vernon's Ann. Texas Stats. Tarrant County Water Control and Improvement Dist. No. 1 v. Fowler, 175 S.W. 2d 694, Texas Civ. App., wr. ref. w.o.m., 179 S.W. 2d 250. See also, Tarrant County Water Control and Improvement Dist. No. 1 v. Reid, 203 S.W. 2d 290, wr. ref. n.r.e.

■ There was no error in the trial court's action in excluding from evidence a deed from the City to the Authority which contained a purported release. The conveyance of a small tract of 3.94 acres described in the deed is immaterial to any issue in the present case. Such deed was evidently prepared by using a printed form and was dated in January of 1939. It bore the signature of the then mayor of the City of Graham. The release provision contained therein read as follows:

"The Grantor, for himself and his successors in title, hereby releases the Grantee from liability for damages resulting from overflowing or flooding any other lands owned by him occasioned by the construction, operation or maintenance of said Possum Kingdom Dam, including, but not limited to, the following lands:"

It was recited in the deed that the mayor was acting under authority of a resolution by the City Council. This resolution authorizes the mayor to "execute a proper deed of conveyance of the interest of the City of Graham to said property (the 3.94 acres), the same to be duly attested by the city secretary and the corporate seal thereto affixed". The deed was not signed by the city secretary nor was the corporate seal affixed thereto. These circumstances are probably immaterial in that the resolution does not authorize the mayor to execute any release, covenant, contract or other written instrument than a conveyance of the specified property. It has been held that an authorization to "make a deed" empowered a mayor to insert a covenant of general warranty into the deed. Abbott v. City of Galveston, 97 Texas 474, 79 S.W. 1064. However, we find no authority and know of no general agency principles which would empower a mayor, authorized simply to "execute a deed", to also execute such a sweeping release from liability for flooding all of respondent's other lands as asserted here by petitioner. To the contrary, it appears that whenever a mayor exceeds his delegated authority to contract, the city is not bound, except perhaps in certain cases to the extent of benefits already received. City of

Bryan v. Page, 51 Texas 532; City of Laredo v. Macdonnell, 52 Texas 511; Penn v. City of Laredo, Texas Civ. App., 26 S.W. 636, no writ hist.; City of Tyler v. Adams, Texas Civ. App., 62 S.W. 119, no writ hist.; Indiana Road Mach. Co. v. City of Sulphur Springs, Texas Civ. App., 63 S.W. 908, no writ hist.; 30-A Tex. Jur.; Municipal Corporations, Sec. 449. There is nothing in the record which would support a finding of estoppel or ratification by respondent city of the unauthorized release. Article 974d-5 has no relevance to the present factual situation.

We are further of the opinion that no reversible error is shown in connection with the special instructions given by the trial court with reference to the damage issues. As heretofore pointed out, special issues were submitted to the jury relating to the depreciation in the intrinsic value of the sewage disposal plant and the water treatment plant of the City caused by the construction, maintenance and operation of the Possum Kingdom Dam. In this connection, the trial court defined "intrinsic value" so as to authorize the jury to consider such matters as replacement cost, depreciation, anticipated serviceable life, general usefulness, and such other matters as have a bearing upon the actual value of the property. The jury was further instructed that in considering the value of these plants it was "not to consider the possibility of constructing levees or dykes around the plaintiff's sewage disposal plant or water treatment plant". Petitioner claims that this latter instruction was prejudicial and constituted a comment upon the evidence. We do not agree.

■ Had petitioner been entitled to any issues on mitigation of damages, it may well have been relevant to consider the possibility of erecting protective dykes and levees around respondent's plants. But nothing in petitioner's trial pleadings pertains to mitigation of damages, and thus the right to demand a submission of this affirmative defense was waived. Rule 94, Texas Rules of Civil Procedure. Indeed, petitioner seems to have recognized this in the trial court, as its attorneys expressly stated that evidence of the feasibility of dykes and levees was being proferred solely to show that respondent was not maintaining "up-to-date" plants.

In seeking to determine the actual intrinsic value of these plants, it was not relevant to consider what respondent might have done to make them more or less valuable. The jury was properly instructed to consider the value of the plants as they were, and not as they could have been. No one disputes the fact that these plants have been operated without levees for many

years, and it was quite possible for the jury to find that this *absence* of levees lowered the intrinsic value of the plants. Nothing in the trial court's instructions would have prevented it from so doing and hence no prejudicial error is presented.

■ The cause of action relating to the taking of the City's sewage disposal plant is severable from those asserting a claim for damages to the City's channel reservoir and water treatment plant. The judgment of the Court of Civil Appeals insofar as it affirms the judgment of the trial court for a recovery of $139,-250.00 as and for the taking of the City's sewage disposal plant is affirmed. As to the claims asserted against the Authority by reason of alleged injuries to the City's channel reservoir and water treatment plant, the judgments of the Court of Civil Appeals and the trial court are reversed and this cause insofar as it embraces such claims is remanded to the trial court for further proceeding not inconsistent with this opinion.

Opinion delivered October 3, 1961.

MR. JUSTICE SMITH, dissenting.

I respectfully dissent.

Brazos presents three related points, which, if sustained would settle this lawsuit in favor of Brazos. The substance of these points is that the City of Graham, as a riparian landowner, has no vested right to have the water flow by its land with undiminished speed; that the Brazos River Authority is not liable for consequential damages where such damage was caused solely by using the bed and banks of the Brazos River for the storage and flow of water under the statutory direction of the State; and that the city, as the owner of land bordering a navigable stream holds its land under a servitude imposed on it by the grant of the patent whereby damage resulting indirectly from the State's work in the control of floods may not be recovered from the State. See Brazos' motion for judgment non obstante veredicto.

In oral argument, counsel for City of Graham responded to a question from the court by stating the siltation had resulted in the deposit of silt in areas outside the channel of the river. This statement is not in harmony with the City of Graham's pleadings or proof. The city's pleadings clearly set forth that the cause of action alleged depends solely upon the allegation— "this retardation in the flow of the river causes the silt which

is suspended in the water to settle out and be deposited, in the channel of the river,"[1] and *the further allegation that the damage occurred "because the sediment now occupies much of what was formerly the river channel, and the water must now flow on top of the deposit of silt."*[2] There is no allegation in the pleadings that sand was deposited on the property of the city, or that the silt was in any way relevant as a cause of damage except that it was deposited in the *channel of the river*.

Brazos has contended throughout that the city, as a riparian landowner, had no vested right to have the water of the river flow by his land with undiminished speed. Brazos contends further that it was not liable for consequential damages to the city, a riparian landowner, where the alleged damage was caused solely by its use of the bed and banks of the Brazos River for the storage and flow of water under statutory direction of the State.

Brazos is correct in that contention. As a matter of law, the Brazos River Authority is not liable to the City of Graham where the damage claimed by the city resulted solely, as it did here, from siltation in the channel of the Brazos River resulting from the creation of the flood control reservoir impounded by the dam which was located 55 miles down river from the confluence of Salt Creek and the Brazos. The City of Graham is bounded on its west side by Salt Creek, which flows into the Brazos River

---

1. "* * * This retardation in the flow of the river causes the silt which is suspended in the water to settle out and be deposited in the channel of the river. Only a small percentage of the silt which reaches Possum Kingdom Lake continues downstream below Possum Kingdom Dam. The vast majority of the silt is deposited in the lake, principally in the upper portion of the lake. This sedimentation commenced with the completion of the lake in 1941, and has continued without interruption and unabated up to and including the present time, and will continue for the life of Possum Kingdom Lake * * *."

2. "The vast amount of sedimentation described above has caused an aggradation or filling in of most of the channel of the Brazos River in the upper part of Possum Kingdom Lake. Consequently, *as water flows down the Brazos River and into Possum Kingdom Lake, it attains a much higher stage or elevation than it did prior to the construction of Possum Kingdom Dam, because the sediment now occupies much of what was formerly the river channel, and the water must flow on top of the deposits of silt.* The stage or elevation of the water is further raised by the static body of water with which it comes into contact as it enters the lake. The amount by which the elevation of the water in the upper part of Possum Kingdom Lake is raised depends upon the rate of flow down the Brazos River, and, in part, upon the water level at Possum Kingdom Dam. As the sedimentation of silt continues, the elevation of the water impounded in Possum Kingdom Lake during period of moderate to heavy flow down the Brazos River continues to increase in the upper part of the lake. Furthermore, water flowing down Salt Creek is greatly restricted and retarded when there is simultaneous moderate to heavy flow down the Brazos River, thus causing the water flowing down Salt Creek to accumulate and build up along the west part of the City of Graham."

about three miles South of Graham. The dam (Possum Kingdom) was completed in 1941.

The city contends that beginning with the creation of Possum Kingdom Lake in 1941, the flow of the Brazos River and its tributary, Salt Creek, has been retarded in such degree by the static body of water in the lake as to increase the deposit of silt in the river channel thereby causing flood water to attain increasingly higher elevations above the reservoir. The city did not plead that the Brazos River Authority was negligent. The city did not plead or contend that Possum Kingdom Dam was a nuisance.

The pleading of the city makes it plain that the sole function of the dam in so far as the cause of action is concerned is to slow the flow of the river at its confluence with Salt Creek causing a deposit of silt at that point. The effect of the dam is stated to be to *slow the river*. Thus, we do not have a pleading that the dam of itself backed water upon or directly diverted water over the land of the city.

The Brazos River Authority does not contend that in every instance of the exercise of the police power of the State the private citizen is left without redress in damages. Brazos does contend, however, that in the control of floods under the police power of the State, the riparian landowner is not entitled to recover for consequential and indirect damage caused by siltation of the river bed.

It is without dispute that the State owns the bed and banks of the Brazos River, as well as the waters which flow therein, "to be controlled and disposed of by the State for the best interests of all the people". Motl v. Boyd, 116 Texas 82, 286 S.W. 458. In this connection, I am sure the Court has examined plaintiff's Exhibit 26 (a map of Possum Kingdom Reservoir) and plaintiff's Exhibit 35. The former shows the reservoir at elevation 1000 feet, the maximum elevation of impoundment by the dam. Exhibit 26 makes plain the fact that the Brazos River and its channel constitute the "reservoir". While the plaintiff's pleading speaks of siltation in the upper portions of the reservoir, *in fact the siltation of which plaintiff complains occurs in the channel of the river itself, at the point where Salt Creek comes into the river.* The evidence reveals that the main body of water constituting the "lake" is located a considerable distance downstream with the great bulk of it in Palo Pinto County rather than in Young County.

Plaintiff's Exhibit 35 makes it clear that the City of Graham complains only of siltation in the river bed as the cause of its damage. In fact, there is no evidence to the contrary.

The true question is:

Does the State have the right to store water in the channel of the river where the natural consequence of such right is the deposit of sediment (siltation) therein?

I agree with Brazos that the State has every right in the use of its property which a private owner would have *and that under the authorities, the use of land for its natural purpose by an owner cannot give rise* to legal injury, unless negligence or nuisance is established. In this case the City of Graham did not plead and does not contend either that Possum Kingdom Dam was a nuisance or that Brazos was negligent. The city has never denied the legal right of Brazos to use the river bed for storage but has maintained that *all* damages attributable to the use of the river bed may be recovered by the neighboring landowner.

The city has led the Court of Civil Appeals to adopt the erroneous theory that without proving negligence or breach of duty, or establishing that the maintenance of Possum Kingdom Dam was a nuisance, Brazos assumed liability for the operation of the forces of nature and must respond in damages.

The Court of Civil Appeals has declined to say whether the city pleaded an action for damages or for a "taking" under Article I, Sec. 17, of the Constitution.

It appears that the Court here is holding that the city's cause of action as to the sewage disposal plant is one for a "taking", but that "the water treatment plant and the channel reservoir are not in the same category as the sewage disposal plant." In either event, the Brazos River Authority cannot be held liable.

If the cause of action is construed as a "taking", as is being held by this Court, then I believe the rule announced by our Court in State v. Richards, 157 Texas 166, 301 S.W. 2d 597 (1957), is applicable and prevents a recovery of compensation. In that case, we said:

"Police regulations are not unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. Damage to or loss

of property resulting from a proper exercise of such power does not constitute a taking of property under the right of eminent domain, and compensation is not required to be made therefor." Citing Houston & T. C. Ry. Co. v. City of Dallas, 98 Texas 396, 84 S.W. 648, 70 L.R.A. 850; and, Lombardo v. City of Dallas, 124 Texas 1, 73 S.W. 2d 475.

Article 1, Section 17, of the Constitution, does not create a cause of action against the State or a state agency such as the Brazos River Authority unless such a cause of action would have existed against a private owner under the same circumstances. Since this Article of the Constitution only *allows* an action to be maintained if it could have been brought between private persons, I respectfully insist that under the record in this case, the State being a "landowner" and the city being a "neighboring land-owner", fundamental land law applies. Therefore, in storing water in the channel of the Brazos River, the State (Brazos) is using public property for a public purpose and the right of the public so to use its property is to be measured against the right of the neighboring landowner to use his property under common law principles of legal right and duty.

"A loss caused by unlawful act, is within the meaning of the law, an injury for which damages may be recovered, and when through such an act threatened it is made to appear that a nuisance will be created, the act may be prevented by injunction; but a loss resulting from an act lawful within itself furnishes no ground for the recovery of compensation nor for restraining the actor from the exercise of a legal right." This principle of law was announced in the early case (1889) of Dunn v. City of Austin, 77 Texas 139, 11 S.W. 1125. *In this connection, it should be kept in mind that the siltation of the river bed does not involve, of itself, the "taking or damaging of private property".*

In 16 Texas Jur. 450, Sec. 160, it is said:

"The constitutional provision was not intended to give an action against those constructing public works for acts which would not have been actionable if done by persons in pursuance of a private enterprise."

The general rule, and the one applicable here, is that liability does not arise from the mere exercise of a legal right, though injury may result from it, if such resulting injury "could not have been avoided except by abandoning the right". This principle as well as that stated in Dunn v. City of Austin, supra, is supported

in a number of Texas cases. See Mexican National Construction Co. v. Middlegge, 75 Texas 634, 13 S.W. 257 (1890) ; Gulf C. & S.F. Ry. Co. v. Oakes, 94 Texas 155, 58 S.W. 999, Galveston H. & S.A. Ry. Co. v. Currie, 100 Texas 136, 96 S.W. 1073, 10 L.R.A. (N.S.) 367; Cosden Oil Co. v. Sides, Texas Civ. App., 35 S.W. 815, wr. ref.; Missouri Pac. Ry. Co. v. Platzer, 73 Texas 117, 11 S.W. 160, 3 L.R.A. 639; Houston & T.C. Ry. Co. v. Anderson, 44 Texas Civ. App. 394, 98 S.W. 440, no wr. hist.; Rigdon v. Temple Water Works Co., 11 Texas Civ. App. 542, 32 S.W. 828, no wr. hist.; State v. Brewer, 141 Texas 1, 169 S.W. 2d 468; Texas & N. O. R. Co. v. Davis, Texas Civ. App., 60 S.W. 2d 505, no wr. hist.; City of Dallas v. Lawler, Texas Civ. App., 287 S.W. 137; Gainesville H. & W. R. Co. v. Hall, 78 Texas 169, 14 S.W. 259, 9 L.R.A. 298.

The city seems to rest its position squarely on the contention that because Possum Kingdom Dam slowed the flow of water and caused the deposit of silt in the channel of the river, the State is liable for the consequential damage that resulted to the City of Graham as the river channel gradually diminished in usefulness. In other words, the city contends that because the speed of the river at its confluence with Salt Creek was slowed by Possum Kingdom Dam, the city is entitled to maintain a suit for damages which it could attribute to the dam whether directly or indirectly resulting. The city treats the case as though it involves a direct diversion of water by the dam structure, and places the case in the same category as City of Austin v. Howard, Texas Civ. App., 158 S.W. 2d 556, wr. ref. w.o.m, and Ft. Worth Imp. Dist. No. 1 v. City of Fort Worth, 106 Texas 148, 158 S.W. 164, 48 L.R.A. (N.S.) 994. These cases are not in point. There the agency erected a levee which of itself immediately diverted the flow of the river directly onto the land of the plaintiff. In the present case Possum Kingdom Dam did not directly divert water onto the land of the city. The effect of the dam was to create the lake, which in turn caused the flow of the river above the lake to be slowed, thereby causing the natural silt to be deposited in the bed of the river.

The Court says, in effect, that there can be no valid distinction between a situation where flooding results from the building of the dam only and flooding which occurs as a result of the construction of the dam and the resulting siltation of the reservoir acting together. With this I cannot agree. The Court has failed to recognize that in Texas the river bed is owned by the State and that the accumulation of silt in the bed of the river as the result of the lawful construction of the dam does not amount to a trespass. The city relies upon cases from other jurisdictions. In

those States the river beds are owned by the adjoining landowner to the center of the stream. The river bed, therefore, is not public property. Clearly, a different legal relationship exists. On the one hand, where the river bed is not owned by the State, the deposit of sand or siltation would be a trespass, whereas, in Texas, the river bed is owned by the State, and the State as any other landowner has a right to use its property (in this case, the channel of the river) so long as the dam is not a nuisance per se and is not negligently operated.

The Court seems to give some weight to the fact that the siltation of the river bed is foreseeable. In this connection, I re-emphasize that no legal right of the city has been invaded by Brazos. The city does not contend that Brazos has trespassed upon its property or that the authority has directly invaded its land. The conclusion is inescapable that the city must stand or fall on its only pleadings and proof that as a consequence of the construction of a public work, the waters of the river have been slowed so that silt is deposited to the point that subsequent floods are not contained within the banks of the river as in a state of nature. By such pleadings, the city unquestionably is maintaining that it has the legal right to have the water of the river flow by its point of confluence with Salt Creek at undiminished speed. Unless the city has such vested legal right, it cannot possibly establish a cause of action resting solely upon the deposit of silt in the bed of the stream. Whether the Authority could foresee that the river would continue to carry its load of silt through the years, and that the silt would be deposited at the confluence of Salt Creek and the Brazos River, or whether it could not foresee such deposit, the fact remains that the deposit of silt in the bed resulted solely from the slowing of the river. It is my position that the Authority's control of floods under the police power of the State which naturally results in siltation of the river bed cannot be the basis for the city's recovery of consequential and indirect damage.

The principles of law announced by this Court in Motl v. Boyd, supra, in 1926, are controlling here. Those principles should not be brushed aside with the mere statement that we have something here which involves more than "the slowing of the waters running in the stream adjoining his (riparian owner's) land". Brazos is not attempting to pulverize the problem into "molecular parts", but on the other hand is following cases which have long recognized that rivers such as the Brazos are public navigable streams under the statute, and that the title to the waters of such streams is in the State in trust for the public.

It is inconceivable that this Court is now ready to forget that the rivers of Texas have "certain characteristics which must be observed in determining the rights of the people" where such streams are involved. Are we going to forget that the Brazos River Authority is basically a public enterprise, created by the legislature for the general governmental purpose of effectuating adequate protection for the lives of the people, as well as for the property within the Brazos River watershed?

The City of Graham has convinced a jury and trial court that it is entitled to the sum of $430,750.00 in damages for the taking of its sewage disposal plant, water treatment plant, and channel reservoir. The finding of the jury is that these plants now have only a salvage value of $750.00, $1500.00, and "none", respectively, whereas, the truth is that all of these plants are still in use. This tremendous award has been made in spite of this fact, and in the face of the city's pleadings that "the siltation, past, present and future, of Possum Kingdom Lake is the natural result and consequence of the construction, maintenance and operation of Possum Kingdom Dam * * *." This Court in affirming the judgment for the taking of the sewage disposal plant completely overlooks the economic importance of the Brazos River Authority and its watershed, and the tremendous benefits which have resulted as a consequence of the construction of the dam.

The case of Brazos River Conservation & Reclamation District v. McCraw, 126 Texas 506, 91 S.W. 2d 665 (1936), was an original proceeding brought by the Authority against the Attorney General for writ of mandamus directing that officer to approve the proposed bonds of the district in the sum of $3,600,000. The record in that case shows that in 1936 the Brazos River watershed comprised:

"* * * one of the largest agricultural regions of Texas, and contains extensive natural gas and oil fields. It contains within its bounds more than 3,500 miles of main line railroad, and in excess of this mileage of federal and state highways. Within this watershed there is nearly 10,000,000 acres of land in cultivation, the cotton acreage alone is more than 4,500,000 acres; within the area there are more than 1,500,000 head of cattle, more than 500,000 head of sheep, and more than a quarter of a million head of hogs; the annual production of minerals runs into millions of dollars; and within the area there are many towns and cities, factories, etc.

"The agreed statement of facts not only shows that the

state not only owns and operates a great many miles of state highways in the watershed of the Brazos, but a great number of expensive bridges as well, 'which are constantly imperiled and frequently damaged or destroyed on account of said flood waters; that the soil in parts of the watershed is becoming badly eroded due to lack of control of said waters'. The state through its prison system also owns and operates 57,000 acres in prison farms in Fort Bend and Brazoria counties which are subject to periodical overflows of the Brazos, which have occasioned the loss of $3,000,000 in property to the state during the last fifteen years."

The record further shows:

"The United States government has made a grant to the relator district in the amount of $30,092,345 to finance or aid in financing some thirteen reclamation projects, each consisting in the erection of a dam across the Brazos River or one of its tributaries, and the equipment of certain of said dams for the manufacture of hydro-electric power. This grant is contingent upon the district's securing funds sufficient to purchase the lands, etc., needed for said purposes.

"The board of directors of the district has adopted a resolution authorizing the issuance of $3,600,000 of bonds, and has provided therein that said bonds shall be secured by and shall be payable out of the state taxes granted to the district by Senate Bill 3. Inasmuch as the revenues from the operation of the various projects could not be forecast with a reasonable degree of accuracy at this time, the board decided first to issue the bonds secured primarily by a pledge of the allocated taxes, and secondarily by current revenues; and at a later date to issue $5,000,000 of bonds secured primarily by the revenues from the operation of the projects.

"To aid the district in carrying out its purposes the state by chapter 368, General and Special Laws of the First Called Session of the 44th Legislature 1935 (Vernon's Ann. Civ. St. art. 8194 note), allocated to the district for twenty years the state ad valorem taxes to be collected for general revenue purposes upon the property and from persons in *Austin, Brazoria, Burleson, Fort Bend, Grimes, Waller, Washington, Brazos, Milam,* and *Robertson* counties, each of which is within the section of periodic overflows of the Brazos river; provided, however, that in no event should the amount granted exceed in any one year a total sum of $309,000."

"Sec. 5. The District shall have the authority and it is hereby authorized to issue its negotiable bonds, secured only by pledge of the sums granted and/or donated by the State of Texas and/or out of any other current revenues of the District in any such amounts as may be authorized by the Directors of such District, which sums shall be paid to the legal holders of said bonds, for the purpose of purchasing, acquiring and/or condemning lands, leases, easements and/or acquittances, rights-of-way, structures and/or buildings, equipment and/or operation of proper structures, dams, reservoirs, suitable *for the control of the recurrent, devastating floods in the valley of the Brazos River, which have over a long period of years, caused a deplorable loss of life and property, and the erosion of the soil and a depletion of the fertility of the lands in said valley and the watershed served by the Brazos River in Texas, and the public highways and structures and lands belonging to the State of Texas situated within said watershed; all of which is hereby declared to be a public calamity,* and doing all things necessary in the execution of the purposes for which the District is created and exists. The moneys herein and hereby granted and/or donated to the Brazos River Conservation and Reclamation District are declared to be for the purposes of discharging obligations herein authorized. [Italics supplied.]

Obviously, direct damage to property involved must be paid for. Brazos fully appreciates this fact. It does not claim that it is exempt from Article I, Section 17 of the Constitution. Its position is limited to the contention that gradual and indirect damage attributable in part to the construction of the dam by the State for flood control and in part to the slow and gradual work of the forces of nature may not be recovered by the city, a riparian owner.

If the City of Graham is sustained in its unprecedented position, then a similar cause of action will exist in all of the land-owners above the reservoir as the process of siltation inevitably continues. It is not unreasonable to say that the collection of silt in the flood control reservoir at Possum Kingdom Dam, not only affects landowners above the dam, but those below as well. The silt no longer goes down the river below the dam. Formerly the periodic floods spread the rich deposits over the bottom lands in the lower river. Unquestionably, the State has prevented the process of nature and has stopped the annual deposits in the lower farms. If the City of Graham has a cause of action, why not the lower landowners? If the city has the right to have the river flow by its land as in the state of nature, do not lower landowners have a

similar right? In any event, if the riparian landowners have such right, then the only sure way to secure them that right would be for Brazos to cease exercising its legal right to perform the functions for which it was created which is to control the recurrent, devastating floods in the valley of the Brazos River.

The Brazos River Authority, from the time of its creation, has relied upon the doctrine of riparian rights and burdens under Texas law peculiar to its geography and legal heritage. The State's ownership of the bed and the banks of our navigable rivers is an inherent tradition of our legal system, necessary for the development of the large areas of the State which are semi-arid. The correct application of the principles of Texas law which apply to this case are most important to the people of the State. The recurring floods on Texas rivers with attendant devastation led to the adoption of Article 16, Sections 59 (a), (b), and (c) of the Constitution. This amendment declares the preservation and conservation of the water resources of the State to be "public rights and duties" and commanding the Legislature to "pass all such laws as may be appropriate thereto".

Subsection (b) of the Conservation Amendment, supra, provides:

"(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the Constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law."

Under authority of these provisions of the Constitution, the Texas Legislature has created many districts and authorities, including the Brazos River Authority, to conserve, control, and utilize to beneficial service the storm and flood waters of the rivers and streams of the State. As a result many projects have been constructed, including Possum Kingdom Dam, by the Brazos River Authority. This amendment is a command and mandate to the State that the State control the floods which ravish the river valleys.

The City of Graham is a riparian landowner just like any other owner along the banks of the Brazos River. The city holds

its lands subject to a burden which was a part of the grant by the State in the patent, *the burden of consequential damage* to its land occasioned by the flood controls of the State. If the indirect and consequential damage which may be traced in some degree to the reservoir or the dam is compensable under Article I, Section 17 of the Constitution, then the Authority will do well to meet the demands of riparian landowners much less perform the only service for which it was created. The McCraw case, supra, points out the tremendous responsibility which rested upon the Brazos River Authority in 1936. The Act creating the Brazos River Authority (Art. 8280-101, Sec. 2, Vernon's Annotated Civil Statutes) declares that the Authority "shall have and be recognized to exercise such authority and power of control and regulation over such storm and flood waters of the Brazos River and its tributaries as may be exercised by the *State of Texas,* subject to the provisions of the Constitution and the Acts of the Legislature." [Emphasis added.]

In further recognition of the State's responsibility in the field of water resources development and use, the people, in 1957, voted overwhelmingly to further amend the Texas Constitution by adding Section 49c to Article 3, creating the Texas Water Development Board and providing for the issuance and sale of general obligation bonds of the State in the amount of $200 million "for the purpose of aiding or making funds available to the various political subdivisions or bodies politic and corporate of the State of Texas including *river authorities,* conservation and reclamation districts and districts created or organized or authorized to be created or organized under Article XVI, Section 59 or Article III, Section 52, of this Constitution, interstate compact commissions to which the State of Texas is a party and municipal corporations, in the conservation and development of the water resources of this State, including the control, storing and preservation of its storm and flood waters and the waters of its rivers and streams, for all useful and lawful purposes * * *." [Emphasis added.]

The State's financial assistance is given in the form of interest bearing loans after determination of eligibility of the district, municipality or authority for a loan, together with the need for, and the economic and engineering feasibility of, the project.

In order to properly finance construction of such a project, the state water districts and authorities engaged in building dams and reservoirs must know in advance of construction the total cost. The Texas Water Development Board must have the same in-

formation in passing on applications for loans from the State. This would be virtually impossible if the trial court and the Court of Civil Appeals judgments are allowed to stand, even to the extent of affirming the judgment for $139,250.000. For example, if the City of Graham, located some 55 miles upstream from the dam, can file suit some 16 years after the dam has been completed for damages alleged to have occurred some 12 years after completion, and recover as damages full value of its sewage disposal plant, water treatment plant, and channel reservoir, and continue to use said facilities as before alleged damages occurred, Texas will be through financing dam and reservoir projects at the State and local level.

The Texas Board of Water Engineers has recently published its plan for meeting the 1980 water requirements of Texas.

Is the Brazos River Authority to be permitted to carry out the mandate of the people? Or, is this Court going to place in the hands of the riparian landowners the power to destroy the Authority itself by depriving it of the funds intended for lawful use?

I respectfully ask: Is the Brazos River Authority to be permitted to carry out the mandate of the people? Or, is this Court going to place in the hands of the riparian landowners the power to destroy the Authority itself by depriving it of the funds intended for lawful use?

Granting, for the sake of argument, that the Court is correct in its conclusion that the case of Motl v. Boyd, supra, did not require an analysis of the land law of Texas and the determination of the precise question of whether the riparian landowner had the right asserted in the present case, nevertheless, this Court in that case pronounced the law in accordance with the contentions of Brazos. I particularly refer to that portion of the opinion which is applicable here:

"Flood waters are all waters which may contribute to an overflow or flood; and all waters above the highest normal flow of the stream are potentially flood waters, *and we believe subject to regulation and control by the state, regardless of the riparian's land which may border upon the stream. If we say that the riparian has a vested right in the flood waters of a stream, then we effectually deny the right of the state to control the floods, a holding which would for all practical purposes invalidate the conservation amendment and all our irrigation and reclamation statutes.*" [Emphasis supplied.]

I contend that flood waters are to be treated as a common enemy, the control of which is a public right and duty so far as the Brazos River Authority is concerned. If the City of Graham prevails, then effective flood control by the Brazos River Authority would become impossible. The Court in the Motl case said:

"The construction, therefore, which we have given the statutes, is one consistent with the effective control of floods and one absolutely essential if flood prevention and control is to be successfully carried out along the rivers of this State."

I cannot agree with the Court's conclusion that the case of United States v. Dickinson, 331 U.S. 745, 67 S. Ct. 1382, 91 L. Ed. 1789; decided June 16, 1947, by analogy or otherwise, is in the least controlling here. That case was brought under the "Tucker Act". The Tucker Act, Title 28 U.S.C. Sec. 41(20), Jud. Code Sec. 24(20), was combined in 1948 with provisions of the Tort Claims Act (formerly Title 28, Sec. 931(a); its new citation is Title 28, Secs. 1346, 2401-2. As used by the United States Supreme Court in this case (1947), the Act related to the jurisdiction conferred upon the U.S. district courts in actions against the United States, and the procedures therein involved.

It should be noted that the Court of Civil Appeals and this Court fail to give the background of the Dickinson case. Neither opinion clearly points out that the Government *without* condemning the land, dammed a river and raised the water level by successive stages until it flooded part of the respondent's land.

In that case, the Government *chose* not to condemn the land but to bring about a *taking* by a continuing process of physical events. The U.S. Supreme Court held that in such a situation, the owner was not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what really is *"taken"*.

The court held:

"All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken'."

What was the "continuing process of physical events" in that case?

Since no condemnation proceedings were ever instigated, no time was fixed by legal proceedings as to when the land was "taken".

The dam was constructed. The ultimate elevation of the river to 566 feet above sea level was reached on September 22, 1938. This elevation was accomplished as a direct result of the *construction* of the dam. Nothing resulted from operation or maintenance of the dam. These are the "physical events" which led immediately after September 22, 1938, to the raising of the river to the stage where the land belonging to Dickinson was "permanently flooded". In addition, erosion attributable to the construction of the dam damaged the land which formed the new bank of the "pool". No comparable facts exist in our case.

The question of limitation was invoked by the Government. It seems that 6 years was the limitation period.

The court on this said:

"We find that the taking which was the basis of these suits was not *complete* six years prior to April 1, 1943, nor at a time preceding Dickinson's ownership."

The "taking" undoubtedly was attributable to the *construction* of the dam.

It seems plausible to conclude that in our case we have a lawful construction of a dam which caused no "taking" of the City of Graham's land by permanent flooding or inundation. We simply have a case which is a suit for consequential damages as a result of the operation and maintenance of Possum Kingdom Lake. It is also difficult for me to accept the proposition as stated in Bauman v. Ross, 167 U.S. 548, 574, as being applicable here.

Do we have the same situation here as in that case? Can it be said that the City of Graham's land involved here is land "not taken" at the time of the construction, and that Brazos River Authority is liable under the theory that—

"When part only of a parcel of land is taken for a highway [lake], the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but

the incidental injury or benefit to the part not taken is also to be considered?"

I think not.

In our case, the land does not lie within the reservoir pool itself. Nor is it contended that the dam directly diverts water over the land of the respondent city.

Nor does the City contend that the liability of the Brazos River Authority is exactly the same under law as if the Brazos River Authority were a power company constructing a dam for private profit. Of course, the rules of law deny that.

The Court of Civil Appeals has assumed that the slowing of the river past the City's land, and the resulting deposit of silt or sediment in the bed of the river, was a legal wrong to the plaintiff which entitles it to maintain a claim for damages because the *silt was deposited in the river*. Such assumption of the Court of Civil Appeals is erroneous and the court is in error in affirming the judgment for $139,250.00.

Another question is presented.

"When the floods are brought under control by flood reservoirs are those who claim a benefit (City of Graham) from the free flow of the flood waters entitled to damages when they are slowed and thereby cause a gradual diminishing of the channel's capacity?"

Mere ownership of riparian land along the banks of the Brazos River does not give the plaintiff a right of action for injury to the land, unless the injury is inflicted in violation of a legal right held by the plaintiff as such riparian owner.

The Court of Civil Appeals in this case has erroneously assumed that in any case where private property is injured by public construction, the Constitution in Article I, Section 17, creates a right of action and a claim for damages in the property owner. This is not the law. See Tex. Jur. Sec. 160, p. 450; Texas & Sabine Railway Co. v. Meadows (1889), 73 Tex. 32, 11 S.W. 145; City of Amarillo v. Gray, Texas Civ. App., 304 S.W. 2d 742; City of Amarillo v. Stockton, 158 Texas 275, 310 S.W. 2d 737; see also State v. Brewer, 141 Texas 1, 169 S.W. 2d 468.

The trial court submitted the Gray case, supra, to the jury

on the absolute liability theory under Art. 1, Sec. 17 of the Constitution. The Court of Civil Appeals reversed and remanded holding that the trial court erred. We approved this judgment of the Court of Civil Appeals in City of Amarillo v. Stockton, supra.

In the present case, the City of Graham, just as Gray, supra, alleged liability for its damage arose out of the constitutional inhibition that "no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made * * *."

The trial court, just as in Gray, applied this absolute liability theory, and submitted to the jury only the issues inquiring as to damages.

The motion for summary judgment filed by Brazos should have been granted. That motion reads in part as follows:

"In accomplishing according to law the purposes for which it was created, this defendant completed construction of Possum Kingdom Reservoir in the year 1941, and has since such time been engaged in the governmental duty of operating said reservoir for and on behalf of the State of Texas. Said water reservoir has been in operation since its completion and Brazos River Authority in operating Possum Kingdom Reservoir is, and at all times has been engaged in a governmental function for which, as a matter of law, there can be no liability for damages alleged to have resulted by reason of the complained of sedimentation of said reservoir caused by natural phenomena during a period of over fourteen years."

"Plaintiff has stated no cause of action against defendant, Brazos River Authority, because mere allegations and proof that Possum Kingdom reservoir caused water to back upon and flow certain lands of plaintiff, and without allegations and proof of a negligent tort by defendant, are insufficient in order to render defendant liable for claims of compensation asserted under Article 1, Section 17 of the Texas Constitution because:

"(a)  The principle of 'Damnum Absque Injuria' has not been modified by the provision of Article 1, Section 17 of the Texas Constitution.

"* * * (c) Article 1, Section 17 of the Texas Constitution

allows recovery for damages, or takings, only when the damages alleged against the State would be compensable for wrongs done in private enterprise; that the said constitutional provision is a 'waiver of State immunity' and that as a matter of law no liability can exist under the facts alleged since negligence is neither alleged, nor could allegation and proof thereof render this defendant liable under any theory of law."

Since it clearly appears as a matter of law that the Brazos River Authority had the legal right to construct Possum Kingdom Dam and store water in the channel of the Brazos River, and since any damage which resulted from the deposit of silt in the channel of the river is a natural consequence of the exercise of legal rights conferred and duties imposed upon the Brazos River Authority by the laws of the State of Texas, I would reverse the judgments of the trial court and the Court of Civil Appeals and render judgment that the City of Graham take nothing by its suit.

Although I am convinced that judgment should be rendered in favor of Brazos on the points heretofore discussed, I deem it necessary, in view of the Court's opinion, to state additional reasons for either rendering judgment in favor of Brazos, or reversing the judgment of the courts below and remanding the entire case to the trial court for a new trial.

First, I shall discuss the limitation question. Granting for the sake of argument that the existence of a cause of action for this indirect and consequential sort of damage, resulting from the siltation of the river bed of the Brazos, the instant suit, brought by the City of Graham in September, 1957, is nevertheless barred by the Statute of Limitation.

The determination of the limitation question depends, in turn, upon the determination of three subsidiary questions. First, is the suit brought by the City of Graham one for "damage" to its facilities, to which the two-year Statute of Limitation is applicable rather than one for the "taking" of such facilities? Second, if the City's suit is one for "damage", when did such cause of action arise? The third question involves the City's contention that because of the 1953 amendment to Article 5517, Vernon's Annotated Civil Statutes, the City of Graham has been granted immunity from the laws of limitation.

(a) THE SUIT IS ONE FOR "DAMAGE" TO PROPERTY RATHER THAN FOR A "TAKING" THEREOF.

I disagree with this Court's holding that this is a suit for a "taking". Even the Court of Civil Appeals in affirming the trial court's judgment declined to hold that the instant suit was one for a "taking" of the plaintiff's property. It did not decide but brushed off the defense of limitation by saying that the two-year Statute probably did not apply to incorporated cities and that even if it did, the cause of action pleaded by the City was not shown to have accrued more than two years before the suit was filed on September 19, 1957. The Court of Civil Appeals comments additionally that "no issue was submitted or requested touching the defense of limitation" thereby inferring some sort of waiver of the defense. The court cited as authority for its holding Baker v. City of Fort Worth, 146 Texas 600, 210 S.W. 2d 564, 5 A.L.R. 2d 297.

The constitutional provision involved, Article 1, Section 17, reads in part as follows:

"No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, *when taken*, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; * * *." (Emphasis added.)

Because of the fact that the Constitution itself distinguishes between a "damaging" of land, and a "taking" thereof and requires pre-compensation in case of the latter, the courts have had frequent occasion to construe Article I, Section 17 and to give effect to the distinction therein made.

The early case of McCammon v. Trinity & B. V. Ry. Co., 104 Texas 8, 133 S.W. 247, decided by the Supreme Court in 1911, and the others which have followed it, establish the proposition that a "taking" must result from an actual physical invasion of property and that damage to land not actually and physically taken or used affords a cause of action for damage to land only.

This distinction between a "taking" of land and a "damaging" thereof has been followed without departure for so many years that the law involved has become elementary. Stevens v. City of Dublin, 169 S.W. 188, no wr. hist.; City of Port Arthur v. Fant, 193 S.W. 334, no wr. hist.; City of Orange v. Rector, 205 S.W. 503, no wr. hist.; Dallas County v. Barr, 231 S.W. 453, no wr. hist.; Dallas Hunting & Fishing Club v. Levee Improve-

ment District, 235 S.W. 607; Fry v. Jackson, 264 S.W. 612; Johnson v. Lancaster, 266 S.W. 565; Donna Irrigation District v. Piper, 269 S.W. 157; City of Houston v. Wynne, 279 S.W. 916; Holderbaum v. Hidalgo County Water Improvement District, 297 S.W. 865, affirmed Hidalgo County Water Improvement District v. Holderbaum, Texas Comm. App., 11 S.W. 506; Duvall v. City of Dallas, Texas Civ. App., 27 S.W. 2d 1105, wr. ref.; Kahn v. City of Houston, Texas Comm. App., 48 S.W. 2d 595; Shelton v. City of Abilene, Texas Civ. App., 80 S.W. 2d 351, no wr. hist.; Brazos River Authority v. Costello, 142 S.W. 2d 414, 135 Texas 307, 143 S.W. 2d 577; Boyd v. Dillard, 151 S.W. 2d 847, dism. cor. judgment; Tarrant County Water Control & Improvement District Number One v. Reid, 203 S.W. 2d 290, wr. ref. n.r.e.; Webb v. Dameron, Texas Civ. App., 219 S.W. 2d 581, wr. ref. n.r.e.; City of Dallas v. Winans, Texas Civ. App., 262 S.W. 2d 256, no wr. hist.

Writing on this precise question, the Dallas Court of Civil Appeals in Duvall v. City of Dallas, supra, stated as follows:

"Construing this provision of the Constitution our courts have consistently held that a taking of property, within its meaning, is an appropriation, and not simply the infliction of an incidental injury * * *."

It is appropriate to observe at this point that the lands and facilities belonging to the City of Graham have *not* been physically appropriated. The plaintiff's property is not located within the basin of Possum Kingdom Lake nor has the property of the City been destroyed in the physical sense by inundation. The City, in answer to questions from the bench, admitted that all three of the City's facilities, its Sewage Disposal Plant, Channel Reservoir, and its Water Treatment Plant were still being used daily by the City of Graham. The gravamen of the plaintiff's complaint is therefore seen to be, not that its facilities have been physically taken and appropriated, but only that the recurrent flooding of which the City complains has interfered with the use of these facilities to such extent as to destroy completely their value to the City.

The case of Tarrant County Water Control & Improvement District Number One v. Reid, 203 S.W. 2d 290, wr. ref. n.r.e., is the only prior case in Texas involving a claim of damage because of the siltation of the State's river beds brought about by the construction of the great flood control and conservation

storage projects which are essential to the economy of this semi-arid region.

The Reid case, although it involved a claim of damage to a pecan grove rather than to a municipal facility, is on all fours with the case at bar. Reid contended, as does the City of Graham in this case, that the overflow damage to his land amounted to a "taking" thereof because such overflow had been caused by the deposit of silt in the river channel brought about by the slowing of the velocity of the flow in the West Fork of the Trinity which had been caused by the construction of Eagle Mountain Dam and Lake in 1934.

Reid alleged that the damage to his land began in the year 1941. The Fort Worth Court of Civil Appeals, declining to decide whether Reid had a valid cause of action or not, held that in any event Reid's claim was based upon a "damaging" of his property rather than a "taking" thereof, and that a suit to recover such damage brought in 1945 was barred by the two-year Statute of Limitation. The Court distinguished the case before it from the holding in Tarrant County Water Control & Improvement District Number One v. Fowler, Texas Civ. App., 175 S.W. 2d 694, wr. ref. w.o.m by the Supreme Court, 142 Texas 375, 179 S.W. 2d 250, saying:

"An analysis of the holding in the Fowler case, supra, reveals that the dam under discussion in that case was constructed so as to 'take' Fowler's land *by submersion. It was to be a part of the lake basin* * * *." [Emphasis added.]

This same distinction exists with reference to the present case. The Reid case therefore is direct authority for the proposition that siltation cases, such as the one here, involve a claim for "damage" to land and not a "taking" thereof. It was probably for this reason that the present Fort Worth court, recognizing the possibility of conflict, refused in the instant case to hold contrary to its earlier decision.

(b)  THE INSTANT CAUSE OF ACTION TO RECOVER FOR PERMANENT DAMAGE TO THE PLAINTIFF'S FACILITIES ACCRUED MORE THAN TWO YEARS PRIOR TO THE TIME SUIT WAS FILED.

Before the Court of Civil Appeals wrote its opinion, all of the parties, including respondent and its attorneys, assumed that the City's cause of action arose in July, 1953. There was

no argument on this point. Respondent had affirmately asserted in its brief in the Court of Civil Appeals that the cause of action has arisen in July, 1953, making this assertion as a part of its argument that the cause of action had not arisen at a date earlier in point of time so as to put in motion the ten-year Statute of Limitation.

This ground of the Court of Civil Appeals opinion, that it was not shown that the cause of action arose more than two years before the suit was brought, was therefore a ground which had never been urged by the City. As a matter of fact, the holding is not only directly at variance with the City's theory of the case but it is based upon Baker v. City of Fort Worth, a case not in point and not even referred to in respondent's brief in the Court of Civil Appeals. The Court of Civil Appeals misapplied to the case at bar the rule laid down in the Baker case. The same error was made by the Austin Court of Civil Appeals in Fromme v. Tennessee Gas Transmission Company, 263 S.W. 2d 574, and the error was corrected by this Court in Tennessee Gas Transmission Company v. Fromme, 153 Texas 352, 269 S.W. 2d 336. We reversed the judgment and specifically held that the Baker doctrine was not applicable and that the cause of action asserted by Fromme was barred by the two-year Statute of Limitation.

As is made plain in the Fromme opinion, the difference between the Baker case and the Fromme case is the fundamental difference between an action to recover for *temporary* or transient damage and one to recover for *permanent* damage to land. The same difference exists between the Baker case and the present case.

Having reviewed the City's pleadings, the testimony of its witnesses and the written arguments filed by it both in the Court of Civil Appeals and in this Court, I am convinced that the cause of action sought to be alleged by the City is one for the recovery of permanent damage to its lands and facilities brought about by the siltation occurring in the Brazos River bed and Possum Kingdom Reservoir following the construction in 1941 of the Possum Kingdom Dam. I am equally convinced that the City took the position in its pleadings and supported it by the testimony of its witnesses that although the dam was completed in 1941, the onset of the injury to its lands and facilities began in July, 1953.

As pointed out in the Fromme opinion, the rule laid down

by Judge Stayton in Houston Water-Works v. Kennedy, 70 Texas 233, 8 S.W. 36 (a case basic to the decision in the Baker and Fromme cases, as well as the case at bar) gives rise to two distinct classes of action. One class of action, that involving a claim for permanent damage to land, arises from the time of the first injury to the plaintiff "be the damage however slight". This was the rule applied in the Fromme case. The second class of action involves a claim for intermittent or recurrent injury to land resulting in temporary damage. In such cases, separate causes of action arise from the date of each injury and plaintiff may recover such damage as has been suffered within the two-year period next preceding the filing of the suit. This was the rule applied in the Baker case.

To what classification of cases does the cause of action here asserted by the City of Graham belong? Even in the brief filed by respondent in this Court it is frankly admitted that the instant cause of action is one to recover for permanent injury to the plaintiff's facilities. At page 48 of its brief in the Supreme Court, the City says:

"Both the Brazos River Authority and the City's witnesses have predicted that the flood hazard from Possum Kingdom Lake will continue to increase. *Nevertheless, this being a suit for permanent injury to the City's facilities, the City has but one cause of action and may have but one recovery.* City of Waco v. Rook, Civ. App., 1932, 55 S.W. 2d 649, * * *." [Emphasis ours.]

Under the pleading, the testimony, the judicial admissions of the City and the applicable law, the instant cause is one to recover for permanent damage to land. The plaintiff itself alleged that the injury complained of began in July, 1953. The testimony of its own witnesses substantiated this date. There had never been, between Brazos and the City, any dispute or difference on this point. Under these circumstances, the statement in the Court of Civil Appeals opinion that "no issue was submitted or requested touching the defense of limitations" is erroneous if it means to imply some sort of waiver of this defense. A fact established by the testimony or admitted by the pleadings is no longer a fact in issue and requires no further proof. Ogden and Johnson v. Bosse, 86 Texas 336, 344, 24 S.W. 798; Houston E. & W. T. R. Co. v. Dewalt, 96 Texas 121, 70 S.W. 531, 17 Texas Jur. 576.

(c)  THE 1953 AMENDMENT TO ARTICLE 5517 DOES

NOT EXEMPT THE CITY OF GRAHAM FROM
THE TWO-YEAR STATUTE OF LIMITATION.

In 1953, the Legislature amended Article 5517, Vernon's Annotated Civil Statutes, to read as follows:

"The right of the state, *all counties, incorporated cities and all school districts* shall not be barred by any of the provisions of this Title, nor shall any person acquire, by occupancy or adverse possession, any right or title to any part or portion of any road, street, alley, sidewalk, or grounds which belong to any town, city or county, or which have been donated or dedicated for public use to any such town, city or county by the owner thereof or which has been laid out or dedicated in any manner to public use in any town, city or county in this state."

This 1953 amendment which added the italicized words, retained the word "Title" which had been substituted in Article 5517 by the Codification of 1925, in lieu of the word "Chapter" which had been used in all of the codifications of the statutes prior to 1925.

The question is whether, by the insertion of the words "all counties, incorporated cities and all school districts", preceding the words "shall not be barred by any of the provisions of this Title", the Legislature intended to extend to these particular governmental subdivisions a complete immunity from all the laws of limitations embraced in Title 91, or whether the Legislature merely intended by the 1953 amendment to exempt such subdivisions from the provisions of the first part of Title 91, which bears the title "Limitations of Actions for Land".

The cardinal rule in statutory construction is the determination of the legislative intent. As stated in Mills County v. Lampasas County, 90 Texas 603, 40 S.W. 403:

"Strictly speaking, there is but one rule of construction, that is, that the legislative intent must govern. All cannons of interpretation so called are but grounds of argument resorted to for the purpose of ascertaining the true meaning of the law."

Our task therefore is simply to find out what the Legislature intended and to give effect to that intention. The rules of statutory construction do not compel the court to come blindly to an unintended result.

In a situation somewhat similar to the one presented here, the Supreme Court of Alabama in Touart v. American Cyanamid Company, 35 So. 2d 484, 488, held that the word "Chapter" as used in Section 6 of an Act in a proviso exempting certain plants from ad valorem tax, would be constructed as referring to "Section" and as not applying to Section 10, exempting plants manufacturing calcium cyanamide, aluminum or aluminum products from state, county, and municipal taxation for ten years, notwithstanding that both sections were located in the same chapter.

In Southwestern Gas & Electric Company v. State, 190 S.W. 2d 132, affirmed by the Supreme Court, 145 Texas 24, 193 S.W. 2d 675, the court said that the terms "Section" and "Article" are interchangeable if that is discerned to be the legislative intent. Other courts have held that "Section" sometimes means "Subdivision", State v. Babcock, 36 N.W. 348; that "Paragraph" can be synonymous with "Section". Lehmann v. Revell, 188 N.E. 531; that "Section" may sometimes mean "Sections", Ellis v. Whitlock, 10 Mo. 781, and at other times a subdivision of a section, Spring v. Collector of City of Olney, 78 Ill. 101, State v. Zimmerman, 204 N.W. 803; that "Section" may mean "provision" and hence not relate to all of the provisions of an entire section, U.S. v. Healey, 160 U.S. 136, 16 S. Ct. 247, 40 Law Edition 369.

Reference to the House and Senate Journals for the Regular Session of the 53rd Legislature indicate quite clearly that the Legislature did not intend to provide blanket exemption from the Statute of Limitations to counties, cities and school districts by the 1953 amendment to Article 5517, Vernon's Annotated Civil Statutes.

In Volume II of the House Journal for the 53rd Legislature, Regular Session, at page 3151 under the title "History of House Bills", the following description of the bill appears.

"House Bill 398. By Mr. Garrett of Nueces: To amend Art. 5517 of RCS of Texas, 1925, as amended, so as to provide that the right of the state, all counties, incorporated cities and all school districts shall not be barred by any of the provisions of this title, etc.: *Concerns right or title to roads or streets, etc., by adverse possession.*" (Emphasis added.)

At page 2272 of the House Journal is recorded the action of the House in placing House Bill 398 on the Local and Uncon-

tested Bill calendar. On the same day, May 14, 1953, the bill was finally passed in the House with only two dissenting votes. (House Journal p. 2281.)

The Senate Journal at page 1393 under the caption "History of House Bills" likewise identified House Bill No. 398 as one which concerned only the matter of limitation of actions for *lands*. This is made plain by the following description of the subject matter of the bill:

"398. Amending Statute of Limitations as to rights of state, county, incorporated cities and school districts to *lands*." (Emphasis added.)

The House Bill was received by the Senate on May 18 (Senate Journal p. 933); immediately referred to committee (Senate Journal p. 951); reported favorably by the committee the following day (Senate Journal p. 954); and on this same day, May 19, 1953, laid out before the Senate and passed unanimously on second and third readings. (Senate Journal p. 1017.)

The foregoing journal references make it certain that the Legislature conceived the amendment to Article 5517 as applying only to Limitation with reference to actions for lands. The ease with which the bill passed the Legislature is evidence of the fact that it was so understood by the members of both the House and Senate. The bill was considered noncontroversial in character and was placed on the Local and Uncontested Bill calendar of the House on May 14. In the next five days of the waning session the measure passed both Houses of the Legislature with only two dissenting votes and was placed on the governor's desk for signature. The bill was signed by him on May 25, 1953. The Legislature adjourned on May 27.

Had House Bill 398 been intended to extend to all incorporated cities, counties, and school districts complete immunity from all Statutes of Limitation, as the City of Graham contends, a more controversial bill could hardly have been presented. A measure introduced for the express purpose of repealing the law of Limitations with respect to counties, incorporated cities, and school districts would undoubtedly have encountered *some opposition*, at least enough to keep the bill off the Local and Uncontested Bill calendar. A bill of this scope and magnitude surely would have encountered enough difficulty in the Legislature to have prevented it from being steam-rollered through both Houses of

the Legislature within the space of five days as an "Uncontested Bill".

If the amendment of 1953 was not intended to exempt the named governmental subdivisions from the bar of limitations in personal actions as well as in actions for the recovery of land, then what was the intent of the Legislature? A review of the background and history of Article 5517, Vernon's Annotated Civil Statutes, together with the history of the 1953 amendment taken from the Legislature Journals, makes it quite certain that the Legislature intended, and only intended, to extend the exemption contained in Article 5517 to cover *all lands* owned by counties and incorporated cities rather than just such lands as had been dedicated or donated to public use as roads, streets, sidewalks, or grounds, and intended further to extend the exemption, in actions for lands, to school districts.

Under this construction the amendment would take care of such cases as Brown v. Fisher, Texas Civ. App. (1917), 193 S.W. 357, wr. ref., holding that limitation title could ripen against the city as to outlying wild and unimproved land; and Texas Company v. Davis, Texas Civ. App. (1936), 93 S.W. 2d 180, wr. ref., holding that school districts were not exempt from the operation of the Statute in actions to recover realty.

In summary, the suit brought by the City of Graham, if it states a cause of action, states one for the recovery of "damage" to its property and facilities rather than for a "taking" thereof. Being a suit for the recovery of *permanent* damages to land, the case is governed by the rule laid down by the Supreme Court in Tennessee Gas Transmission Company v. Fromme, supra, and the cause of action to recover such damage accrued in July 1953. The instant suit brought in September, 1957, is therefore barred by the Two-year Statute of Limitation. This Court should specifically hold that the amendment to Article 5517, supra, did not exempt the City from the Two-year Statute of Limitations.

The remaining point is the contention of Brazos that the trial court erred in excluding from evidence a deed from the City to the Authority. Clearly this was error. On January 24, 1939, the Mayor of the City of Graham executed a deed to the Brazos River Authority conveying a tract of 3.94 acres of land which deed contained a covenant releasing the Authority for damages resulting from the overflowing or flooding any other lands owned by the City occasioned by the construction, maintenance, or operation of Possum Kingdom Dam. The deed contain-

ing the release was filed of record in 1940 and had never been repudiated or questioned by the City until the filing of the instant suit almost eighteen years later. The trial court refused to sustain the plaintiff's exceptions to the pleading of this release but on the trial of the case excluded the deed from evidence.

The deed involved represented a conveyance of property in lieu of condemnation and the City of Graham had the authority to execute this deed and the release embodied within it. Kingsville Independent School District v. Crenshaw, Texas Civ. App. (1942), 164 S.W. 2d 49, wr. ref. w.o.m.

The voluntary conveyance by the City of Graham including the release of damage to its remaining land was neither invalid nor void. There is a presumption that the mayor acted with authority, City of San Antonio v. Newman, Texas Civ. App. (1919), 218 S.W. 128, wr. den.; State v. City of McAllen, Texas Civ. App. (1933), 56 S.W. 2d 297, Texas Comm. App., 91 S.W. 2d 688; 1 McCormick and Ray, Texas Law of Evidence 117. And if that authority had not been formally conferred on the mayor, as plaintiff has contended, the circumstances do not foreclose the possibility that the instrument including the release had been ratified and confirmed by the City's acquiescence over a period of almost eighteen years. Interstate Materials Corp. v. City of Houston, Texas Civ. App. (1951), 236 S.W. 2d 653, wr. ref. n.r.e. The conveyance having been of record more than ten years was, of course, admissible without proof of its execution. Article 3726, Vernon's Annotated Civil Statutes.

Whether the release was included in the deed by reason of mutual mistake or whether the consideration paid by the Authority therefor was inadequate, present issues which the trial court had no right unilaterally to determine as a question of law. Olvey v. Jones, 137 Texas 639, 156 S.W. 2d 977.

The deed was admissible. The release as to damage to other lands owned by the City is recited in the deed. It was no doubt a part of the consideration. At least, it was a question of fact. The City has never repudiated the deed. How can it be said that a separate resolution was necessary?

Plaintiff's Exhibit No. 24 shows the general location of the tract conveyed relative to the location of plaintiff's facilities which are the subject matter of this suit. The 3.94 acres was acquired for the purpose of constructing, operating, and maintaining Possum Kingdom Dam on the Brazos—and the City's

contract of sale so recites. The resolution of the City dated August 11, 1938, the contract of sale executed by the mayor, dated October 4, 1938, and the deed dated January 24, 1939, were tendered as Exhibits 40, 41, and 42.

The trial court overruled all objections to the introduction of these instruments. But, in spite of such action, the court excluded the instruments. The court justfied his action on the theory that one administration could not bind another, etc. This theory was the product of the court's vivid imagination. It was not advanced by either party. The theory was without regard to the record.

The resolution dated August 11, 1938, states the purpose of Brazos River Authority in acquiring the 3.94 acres, a part of the M. Dunn and the M. McGary surveys. It authorized the contract of sale and the deed.

The contract of sale dated October 4, 1938, and the deed were ratified and confirmed. The resolution and deed were filed for record in Young County as one instrument on February 9, 1940. The record shows that prior to the execution of the resolution, contract of sale and the deed, the city officials and representatives of Brazos River Authority discussed the question of flooding the sewage plant, etc. They discussed the elevation at spillway level, etc. The contract of sale and the deed contains the following:

"The grantee contemplates constructing, maintaining and operating Possum Kingdom Dam across the Brazos River in Palo Pinto County, Texas, situated downstream from the property herein conveyed, at an elevation at spillway level 1000 feet above mean sea level. The Grantor, for himself and his successors in title hereby releases the Grantee from liability for damages resulting from overflowing or flooding any other lands owned by him occasioned by the construction, operation or maintenance of said Possum Kingdom Dam, including, but not limited to, the following lands: * * *."

The deed and contract then specifically mention the same two surveys as the ones of which the 3.94 acres is a part. The sewage plant is situated an another survey, the N. White Survey. The Water Treatment Plant and Pump Station (not inundated) are situated on the George Cox Survey. The Channel Reservoir is located on Salt Creek at a point "which bears South 168 feet; Thence North 252 feet from the Northeast corner of the M. McGary Survey, (this is the same survey as the 3.94 acres)

which point on Salt Creek is approximately 1200 feet downstream from the Water Treatment Plant."

I briefly refer to some of the United States Supreme Court cases cited by the Court of Civil Appeals:

Penn v. Mahon, 260 U.S. 393; Pumpelly v. Green Bay Co. 13 Wall 166, 80 U.S. 166, and Mugler v. Kansas, 123 U.S. 623.

The Pumpelly case and the Holderbaum case (Texas case) are cited for the proposition that "It is settled that one who obstructs the flow of the stream so as to make the water flow onto and injure the lands of another is liable." I have no quarrel with such proposition. These cases and the others cited simply have no application here.

Penn v. Mahon, 260 U.S. 393. This case cited by the Court of Civil Appeals is another U. S. Supreme Court case which has no bearing upon the question here. That case involved rights under the Kohler Act. Briefly, the Act provided that it shall be unlawful "so to conduct the operation of mining anthracite coal as to cause the cave-in, collapse or subsidence of (a) any public building or any structure customarily used by the public * * *; (b) any street, road, bridge, etc.; (c) any track, roadbed, right of way, pipe, etc.; (d) any dwelling, etc.; (e) any cemetery or other public burial ground."

This case speaks about regulation under police power, and that if regulation goes too far it will be recognized as a *"taking"*.

Mugler v. Kansas, 123 U.S. 623. This is another U. S. Supreme Court case cited by the Court of Civil Appeals. That case held that state legislation which prohibits the manufacture of spirituous, malt, vinous, etc., intoxicating liquors, does not necessarily infringe any right, privilege, or immunity secured by the Constitution of the United States or by the Amendments thereto.

This case should be reversed and judgment here rendered for Brazos. In any event, the action of the trial court in excluding the deed from evidence deprived the Authority of one of its meritorious defenses. This error alone requires that the entire cause be remanded to the trial court for a new trial.

ASSOCIATE JUSTICES GRIFFIN and HAMILTON join in this dissent.

Opinion delivered October 3, 1961.

ON MOTION FOR REHEARING

NORVELL, Justice.

Both petitioner and respondent have filed motions for rehearing. We first consider that filed by the petitioner.

It is again urged that the evidence does not show a *taking* of the City's sewage disposal plant. In the leading case of Pumpelly v. Green Bay Company, 13 Wall. 166, 20 L. ed. 557, Mr. Justice Miller, speaking for the Supreme Court of the United States, said: "[W]here real estate is actually invaded by superinduced additions of water, earth, sand or other materials, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking within the meaning of the Constitution, * * * this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle."

The evidence in this case (set forth in abridged form in the original opinion) supports the jury's findings which lead to the conclusion that there was a taking of property insofar as the sewage disposal plant is concerned. This plant was constructed before Possum Kingdom Dam was built. It was designed for a highly specialized use and this factor is one which must be taken into consideration in determining whether a constitutional taking has occurred. We are not here dealing with soil or land alone or property that is being used for agricultural purposes, as was the case in Tennessee Gas Transmission Co. v. Fromme, 153 Texas 352, 269 S.W. 2d 336 and Tarrant County Water Control & Improvement No. 1 v. Reid, Texas Civ. App., 203 S.W. 2d 290, wr. ref. n.r.e. There obviously is a difference in the frequency of floodings which effectually destroy the utility of a sewage disposal plant and the frequency which would impair the usefulness of farming land to the point where such floodings could be regarded as a "taking" of property. The circumstance that such property was taken, in the sense of being appropriated to the use of the Authority, prior to the institution of condemnation proceedings does not change the legal situation. The constitutional provision contained in Article 1, Section 17 of the Texas Constitution, like that contained in the Fifth amendment to the federal constitution, has application to cases of inverse condemnation, e.g., that is, cases in which private property is taken or appropriated for public use prior to the institution of formal condemnation proceedings. In such cases, a recovery of compensation may be had by an action in the nature of a damage

suit. See, United States v. Lynah, 188 U. S. 445, 23 S. Ct. 349, 47 L. ed. 539, which deals with an inverse condemnation, follows *Pumpelly* as to a taking, and states that, "[W]hile the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done it is of little consequence in whom the fee may be vested."

The petitioner repeats that this is a case of damnum absque injuria. A number of authorities are cited as supporting this position. There is in the law relating to waters a class of cases which hold that certain injuries to land caused by artificial changes in the channel of a stream in aid of navigation, or the construction of revetment works designed to prevent water erosion are noncompensable. The true basis of the holdings of the navigation cases seems to rest in the police power. See, Hollister v. Union Company, 9 Conn. 435, Fitchburg R. Co. v. The Boston and Maine R. Co., 57 Mass. 58. Then there is a well recognized rule that one may protect his own land by revetment works even though the indirect result of this action may be an injury to another. Henry v. The Vermont Central R. Co., 30 Vt. 638, Lamb v. Reclamation District No. 108, ____ Cal. ____, 14 P. 625. The decisions based upon the principles stated are readily distinguishable from the case before us.

In United States v. Lynah, 188 U.S. 445, 23 S. Ct. 349, 47 L. ed. 539, the government placed dams and other obstructions in a river so as to raise the elevation of the waters and cause them to overflow the plaintiff's rice plantation. The government's action in placing dams in the stream and causing the waters thereof to rise and flood was considered a taking under the fifth amendment. Here there was something more than a mere straightening of a channel or the construction of revetment works. See also, Henry v. Vermont Central R. Co., 30 Vt. 638.

In Archer v. City of Los Angeles, ____ Cal. ____, 119 P. 2d 1, the distinction between obstructing the flow of a stream and another form of injury to property was clearly pointed out. The gravamen of the claim against the City was the construction of drainage improvements in an urban area without providing for additional outlets to carry off the concentration of water. A claim of damages, among others, was made because of the construction of a bridge which impeded the flow of waters in a natural drainage course. The Supreme Court of California made a clear distinction between this claim and the others which were asserted. It was said with reference to the claim based upon the construction of the bridge that "any damage caused by an ob-

struction to the natural flow of the waters is * * * actionable." The plaintiffs did not recover because of a failure to prove that the presence of the bridge actually caused damage.

The distinction is also clearly pointed up in Bedford v. United States, 192 U.S. 217, 24 S. Ct. 238, 48 L. ed. 414, a revetment case, wherein it was said that:

"In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course of years. The case at bar, therefore, is distinguishable from the Lynah case in the cause and manner of the injury. In the Lynah case the works were constructed in the bed of the river, obstructed the natural flow of its water, and were held to have caused, as a direct consequence, the overflow of Lynah's plantation. In the case at bar the works were constructed along the banks of the river, and their effect was to resist erosion of the banks by the waters of the river. There was no other interference with natural conditions. Therefore, the damage to appellants' land, if it can be assigned to the works at all, was but an incidental consequence of them."

See also, Franklin v. United States, 16 F. Supp. 253 and cases therein cited.

In our opinion damage resulting from siltation of a reservoir and consequent flooding of additional lands is comprehended by the rule of United States v. Lynah, 188 U.S. 445, 23 S. Ct. 349, 47 L. ed. 539. We adhere to our holdings upon the point expressed in our original opinion.

■ It is also argued that we erred in our construction of Article 5517, Vernon's Ann. Texas Stats. This limitation point is pertinent only if the flooding of the sewage disposal plant be considered a "damaging" rather than a "taking" under Article 1, Section 17 of the Constitution. Petitioner points out that in many instances the word "Title" was substituted for the word "Chapter" (1911 R.S.) in the 1925 revision of the Texas statutes. This occurred with reference to Article 5683 of the 1911 revision which read, "The right of the State shall not be barred by any of the provisions of this *Chapter*, * * *." This article was rewritten as Article 5517 of the 1925 revision so as to provide that, "The right of the State shall not be barred by any of the provisions of this *Title*, * * *." It seems inescapable to us that if the meaning of a statute is to be determined by the words used by the Legislature, it must be concluded that it was the intention

of the 39th Legislature (1925) to broaden the limitation exemption of the State by substituting the word *title* for *chapter*. It must likewise be concluded that the 53rd Legislature, by the 1953 amendment, intended to place counties and certain other governmental entities on a parity with the State insofar as limitation was concerned, for at that time, the italicized words were added to the article, viz:

"The right of the State, *all counties, incorporated cities and all school districts* shall not be barred by any of the provisions of this Title, * * *."

Other matters raised in petitioner's motion for rehearing were adequately discussed in the original opinion.

The City of Graham complains of our holding that no more than a temporary damage to its water treatment plant was shown. It is said that even the Brazos River Authority recognized that the damage, if any, was permanent. This position was taken by the Authority in support of its contention that the City's action was barred by the two-year statute of limitations. Article 5526, Vernon's Ann. Tex. Stats. It would in no way militate against nor preclude this Court from holding that the City had failed to establish its claim of a taking or permanent damage to the water treatment plant.

Some objection is made by the City to the sufficiency of petitioner's points to raise the issue of temporary damage only. The points and arguments thereunder present the contention that there is no evidence supporting findings that the water treatment plant had either been taken or permanently damaged and hence it was improper to allow a recovery for substantially the whole of the intrinsic value of the plant, particularly in view of the fact that the City continues to control and use the installation. Technically, the theory of temporary or sporatic damage only is in rebuttal of the claim for a taking or permanent damaging. This Court has adopted a liberal rule with reference to the construction of points contained in appellate briefs and applications for writ of error. In Fambrough v. Wagley, 140 Texas 577, 169 S.W. 2d 478 it was said that, "If a point is sufficient to direct the Court's attention to the matter complained of, the Court will look to the 'point' and the statement and argument thereunder to determine the question of reversible error. Simply stated, the Court will pass on both the sufficiency and the merits of the 'point' in the light of the statement and argument thereunder."

We hold that under the rule of the Fambrough case, petitioner's points are sufficient.

◼ In its attack upon our holding that nothing more than a temporary damage to the water treatment plant was shown, the respondent again argues a question which is difficult of satisfactory solution. The matter is rendered complex by the very nature of cities and the complications connected with their growth and development. As pointed out in the discussion relating to the sewage disposal plant, the design, nature and use of the property said to be taken or damaged is an important factor in the problem before us. The respondent points out that the City of Graham is a growing municipality; that its utility installations must, as a consequence, be enlarged; that an efficient and effective water treatment plant is an essential to an urban community; that the City at the present time is confronted with the problem of enlarging its water treatment plant and replacing certain parts and portions thereof which have become obsolete or worn out; that the City has sought competent technical advice in regard to its problems and its engineers have advised the City to abandon the present site and erect a new and larger plant upon a site which would not be subjected to the dangers of flooding by the waters of Salt Creek and the Brazos. It is further argued that portions of the water treatment plant were under water on two occasions—in 1955 and 1957—because of a combination of heavy precipitation in the Salt Creek watershed and simultaneous high water in Possum Kingdom Lake, and that the situation from the City's standpoint is progressively worsening because of the continuing siltation of the reservoir. The City contends that it should not be required to accept the hazard of continuing to operate the present water treatment plant and that the City could not from a financial standpoint, and should not, in view of the threatened flooding occasioned by the construction and operation of the Possum Kingdom Dam by the River Authority, be called upon to erect a new water treatment plant at a suitable location at its own expense.

On the other hand there is a substantial difference between the elevation of the sewage disposal plant—1003.94 feet—and the elevation of the water treatment plant—1019.09 feet. This difference of approximately 15 feet would roughly account for at least 195,000 acre feet of water; that is, some 195,000 more acre feet of water would have to be in the lake in order to flood the water treatment installation than would be required to flood

the sewage disposal plant.[1] Of course, unusual and freakish rainfall conditions in the Salt Creek basin might change the situation somewhat, but the prognosis of repeated recurring floods in the future is not sufficiently established to support the jury's findings which are patently based upon the hypothesis that the water treatment plant has been in effect reduced to a status of no value. While the situation includes elements of possible hardship for the municipality, we cannot say that there is evidence supporting the jury's findings as to the virtual destruction of the water treatment plant.

A somewhat similar, although not identical situation to the present case was considered by the Supreme Court of the United States in Sanguinette v. United States, 264 U.S. 146, 44 S. Ct. 264, 68 L. ed. 608. While the property involved in *Sanguinette* was farming land, this circumstance does not entirely destroy the analogy. The Supreme Court distinguished the case from *Pumpelly* and *Lynah,* supra, (which are applicable to the sewage disposal plant), upon the ground that a constitutional taking was not involved and plaintiff's complaint, if any he had, rested in tort. The Court pointed out that as the result of the construction of a canal by the government and consequent intermittent flooding of plaintiff's lands that plaintiff "was not ousted nor was his customary use of the land prevented, unless for short periods of time. If there was any permanent impairment of value, the extent thereof does not appear. * * * The most that can be said is that there was probably some increased flooding due to the canal and that a greater injury may have resulted than otherwise would have been the case." The Court also said that, "It was not shown that the overflow was the direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by the Government. If the case were one against a private individual, his liability, if any, would be in tort. There is no remedy in such case against the United States."

The provisions of Article 1, Section 17 are broader than those of the federal fifth amendment which mentions only private property *taken* for public use. However, we believe *Sanguinette* does suggest a distinction which is indicated by the evidence in this case, that is, a difference between a taking or destruction of property on one hand and a temporary or sporadic damage thereto on the other.

---

1. This is a rough calculation obtained by multiplying the 7.5 (one half of 15) by 26,000, the normal acreage area of the lake.

We adhere to our holdings expressed in the original opinion and further discussion is deemed unnecessary.

All motions for rehearing are overruled.

Opinion delivered January 24, 1962.